## McDANELL v. HARGROVE.

### No. 5994.

Court of Appeal of Louisiana. Second Circuit.

May 3, 1940.

Rehearing Denied June 10, 1940.

Writ of Certiorari and Review Denied July 18, 1940.

J. Norman Coon, of Monroe, for appellant.

J. H. Dormon and D. Ross Banister, both of Monroe, for appellee.

TALIAFERRO, Judge.

Plaintiff was injured when the one-half (1/2) ton pick-up truck of C. L. Jinks, in which he was riding as a guest passenger, was run into by the heavily loaded Chevrolet truck of defendant, B. Frank Hargrove, then being driven by his minor son, Ben Edsel Hargrove.

The accident happened about 10:30 o'clock A. M. near the north end of a declivity of one hundred (100) feet in the Monroe-Jonesboro highway, the south end of which is at the apex of a levee twenty (20) feet high, crossed at right angles by the highway. The highway at the point of the accident is surfaced with an asphaltic composition eighteen feet wide. The shoulders are six (6) feet wide and graveled. Guard rails line both sides of this one hundred (100) foot section of the road.

Defendant's truck was going north. The Jinks truck was traveling south, but had stopped on its side of the highway near the guard rail, approximately fifteen (15) feet from its north end. Jinks was driving his truck and plaintiff was seated by his side. Defendant's truck came from over the levee at a rate of speed differently estimated by the witnesses.

The location of the Jinks truck when rammed and its movements, if any, between the time it stopped and when rammed, are seriously controverted questions in the case.

Plaintiff was catapulted from the Jinks truck to the gravel shoulder on the west side of the road, landed violently on head, neck and shoulders, was rendered unconscious, and sustained serious injury. He instituted this suit against B. Frank Hargrove to recover damages on account of physical injury, resultant disability, the expenses incurred in treating him and for estimated amounts for future treatment. Hargrove is sought to be held responsible for the son's negligence because of paternity and, in addition, on account of the relation of principal and agent between them. Responsibility for the accident is charged to young Hargrove's negligence and carelessness in these respects, to-wit:

Not maintaining a proper lookout and watch for traffic ahead; driving at an excessive and unlawful rate of speed and on the wrong side of the highway; not applying his brakes or, if applying them, not doing so timely; not sounding his horn nor giving other notice of his approach; driving over the levee at an excessive and imprudent rate of speed in view of the fact that his vision beyond it was obscured.

Defendant admits the happening of the accident alleged upon and that his truck was at the time being operated by his minor son, on a mission for him. He denies all other material allegations relied upon by plaintiff to recover, especially those describing the negligence attributed to the son.

Defendant further avers that when his son came from over the levee and started down its north side, he observed the Jinks truck being backed down the incline and across the highway easterly in front of him; that immediately upon observing this situation, his son applied the brakes and sounded his horn and continued doing so until the impact; that the Jinks truck continued to back across and blocked the highway, leaving on neither side sufficient space for his truck to pass in safety; that, notwithstanding his son's efforts to pass to the west of the Jinks truck, the collision occurred on his (the son's) side of the road. He further avers that the collision was, therefore, caused by the negligence and carelessness of Jinks himself in operating his truck in the manner above related; that his son did all within his power at the time to avert the collision and was driving at the moment thereof not in excess of five (5) miles per hour. He additionally avers that while the Jinks truck was backing down and across the road, plaintiff was standing erect on the right running board directing Jinks in the process of backing the vehicle and was, therefore, actively participating

294

in Jinks' negligence and was himself violating the laws of the state by riding on the running board.

In the alternative, should it be found and held that the accident was caused, to any extent, by the son's fault, defendant pleads the negligence and carelessness of plaintiff in the respects above mentioned as a contributing cause thereof and, for this reason, should be denied recovery.

Plaintiff's demands were rejected and he brings appeal.

We gather from briefs that the trial judge, on account of the conflict in the testimony, was unable to determine which party's contention as to how the accident occurred, was the correct one, and, therefore, rejected plaintiff's demand on the fundamental ground of failure to support the same by a preponderance of the evidence. We have reached a different decision on the pivotal factual question involved and, because of this, shall somewhat elaborately analyze and discuss the testimony directly bearing thereon. The factual question is whether the Jinks truck was rammed by defendant's truck while at stop on its side of the road or while at stop lengthwise across the road.

Mr. Jinks resides in West Monroe, a few miles from the locus of the accident. He decided to make a trip to plaintiff's brother's home in the southern part of Ouachita Parish on the morning of August 3, 1938, and invited plaintiff to accompany him. When a few yards from the north end of the acclivity in the road leading to the levee's top, he was holloed to and waived at by a Mr. Lewis who then lived near the east side of the highway in the proximity of said acclivity. Jinks interpreted Lewis' action as a desire on his part to talk with him and immediately checked the speed of his truck and brought it to a stop on its right-hand side of the road, as above related. The collision occurred within a few seconds thereafter and while Jinks was seated in the truck.

Plaintiff, Jinks, Lewis and his sister, Mrs. Annie Bell Evans, who resided with him, are all positive that the Jinks truck did not move after coming to a stop until rammed by the Hargrove truck. The latter two testified that they were looking directly at the vehicles when the collision occurred. Mrs. Evans was in the door opening on the front porch of Lewis' residence and he was in the front yard adjacent to the highway. All four of these parties testified that the

Hargrove truck, heavily loaded with pulp wood, came over the levee near the road's center, at a rapid rate of speed and gradually veered to its left until the accident occurred.

Young Hargrove testified that as he approached the acclivity on the south side of the levee, he was making thirty-five (35) miles per hour, but that this momentum was reduced as the grade was taken; that when about three lengths of his truck from the levee, another truck, moving rapidly, came from the opposite direction on his (Hargrove's) side of the road; that he instantly cut his truck as far as possible to his right, while the on-coming truck veered to its right, thereby averting a collision; that he then cut back to his left and went over the levee and began the twenty per cent (20%) downward grade at the rate of twenty-five (25) or thirty (30) miles per hour. Describing the collision, he testified:

" * * * and just as I topped the levee, about half way down this levee, on the left hand side of the road from me, I seen this Mr. Jinks with his car; he was backing down the levee. Well, I come on down— as quick as I seen him, though I shot down on my whistle, went to blowing my whistle. When I blew my whistle, he was looking backwards when I first seen him—when I blew the whistle he looked around like that; and when he looked around backing his car, backing his car again, and just about that time he whipped around and whipped the car in front of me on my side of the road; the rear end of his car on the shoulder of the road on my side; just about space for a wheelbarrow to go between the railing and the rear of his car. As soon as he back his car in front of me I seen I was going to either have to hit him or take to the ditch and go in front; first thing I thought of was pull to go in front of him; well, I didn't have time; by that time I had hit the car on my left front wheel—hit his left front wheel.

"Q. Did you ever at any time apply your brakes? A. *Yes, sir, just—well, not quite. No I didn't get on my brakes—I topped the levee and seen the car backing down and I just pushed in on my brakes.* I had my foot on them but was not mashing on them but slowing down. When he whipped around in front of me I just slammed them on with all my weight and reared back and pushed as hard as I could. And when I threw my brakes on I heard a racket somewhere and I thought I tore up my brakes. But I think

it was the load of wood shoved into the cab."

He also testified that the Jinks truck was at stop when struck; that the right front wheel of his truck was facing the left door of the cab of the other truck; that he was going not over five (5) miles per hour at the moment of impact and that he saw plaintiff's body hurled from the running board to the gravel on the opposite (west) side of the highway. He admits that the Jinks truck was knocked fourteen (14) feet by the impact. His testimony is corroborated by a negro helper riding with him at the time; and also, to some extent, by another man who was driving a truck one-fourth (1/4) of a mile north of the locus of the accident. This man's testimony does not favorably impress us.

Young Hargrove's version of the facts of the accident does not comport with common human experience, is at variance with and contradicted by irresistible inferences rationally drawn from undisputed physical facts, and, to some extent, the details given by him are self-contradictory.

The testimony leaves no doubt that the collision was semi head-on. The left front wheel and fender of the Hargrove truck struck at a slight angle the same parts of the Jinks truck. The force of the impact knocked the Jinks truck backward and to its left down the highway. It rested across the east side of the road with front wheels on or very near to the medial line thereof. The Hargrove truck, from the impact, was deflected to its right and rested with its front end near the other truck's front end, facing easterly and across the west side of the road. The movements of these trucks immediately after and as a result of the collision as described above, are not unnatural, but, on the contrary, what we would expect from such a collision.

Young Hargrove would have us believe that his truck lightly ran into the Jinks truck broadside as it occupied his side of the road. Had this been done, the injuries to the Jinks truck would have been on its left side entirely and those to the Hargrove truck squarely across its front end. The Jinks truck would not have rested across the east one-half of the road; and, finally, plaintiff would not have been catapulted to the west side of the highway north of the spot where the Jinks truck originally stopped, as actually happened, but northerly up the road. Force necessary to hurl plaintiff away from the truck a score or more feet could not be created by an impact between a non-moving motor vehicle and one moving at the rate of five (5) miles per hour.

It is shown that the Hargrove truck left skid marks on the asphalt surface from the top of the levee to the locus of the collision. A deputy sheriff who visited the scene after the Hargrove car had been removed, testified: "Seems the truck come over the levee on its entire right side *but gradually from the top down to the scene of the accident he veered over to the center of the road.*"

This officer was asked: "Was there any skid marks on the west or left hand side of the road before you got right to the scene of the accident? His answer was as follows: "Yes, sir, I would say they came over the black line some. I never measured to see how much, but it seems from the looks of the marks from the top of the levee he intended to go around this car on the left hand side if he could."

Young Hargrove's testimony is at variance with that given by this officer and conflicts with defendant's answer, when he says that as he came from over the levee he observed the Jinks truck backing down its side of the road; that it continued to do this until he (Hargrove) was not over twenty (20) feet from it and at this juncture Jinks suddenly backed the truck across his side of the highway, and that then the brakes were forcefully applied.

We are satisfied from the testimony that after Jinks brought his truck to stop it did not move until hit by the Hargrove truck; and that plaintiff was not on the running board at the moment of the collision, but seated beside Jinks inside the cab. Both doors of the cab had previously been removed.

We are convinced that when young Hargrove cut his truck back westerly after dodging the other truck on the south side of the levee, he went over the levee near the road's center at an excessive and highly imprudent rate of speed when the physical conditions and the character of the load he was carrying are weighed. When the character of the load, the nature of the highway there, and the rather sharp grade before him, are considered, the conclusion forcefully arises that it was his duty to have approached and passed the levee's apex at such a rate of speed that he could immediately bring his vehicle under perfect control at an instant's sign of danger.

We are convinced that for the reasons above mentioned, the truck became uncontrollable as the declivity was traversed, and that the Jinks truck was rammed before perfect control could be resumed. This conclusion accounts for the location of the skid marks west of the center lie of the road which the deputy sheriff thought were made in the alleged effort to drive the Hargrove truck in front and west of the Jinks truck.

Defendant's son violated several provisions of the Highway Regulatory Act (No. 21 of 1932, then in force) in operating his truck in the manner found by us. We specifically refer to the following:

Rule of the Road, No. 4, in broad terms prescribes a general rule to be observed by all motorists using the highways of the state. It ordains that it shall be unlawful for any person to drive a motor vehicle upon the highways other than at "a careful, prudent, reasonable and proper speed, having due regard to the traffic, surface and width of the highway, the location and neighborhood, and any other conditions or circumstances then existing." And that "no person shall, under any circumstances or conditions, drive any vehicle upon the public roads * * * at such a speed as will endanger the life, limb or property of any other person." The act further provides that if injury is inflicted or damage done by a driver of a motor vehicle when violating any of said provisions, he shall be "deemed to be prima facie at fault."

Subsection(a) 2 of Sec. 9 of the act reads as follows, to-wit: "Any motor vehicle or combination of motor vehicles shall be equipped with brakes, adequate to stop such vehicle or combination of vehicles upon a reasonably clean, dry, level surface within a distance of forty-five (45) feet from the spot where such brakes are first applied, and when such vehicles or combination of vehicles are traveling at a rate of speed of twenty (20) miles per hour."

If the truck's speed was no more than thirty (30) miles per hour when it started down the declivity, as testified to by the driver, it should have been easily stopped before striking the other truck then over one hundred (100) feet away, according to young Hargrove's version of the accident.

Rule 16(a), § 3, is as follows: "The driver of a motor vehicle traversing defiles, hills or hilly highways shall hold such motor vehicle under control and as near the right hand side of the highway as reasonably possible, and upon approaching any curve where the view is obstructed within a distance of two hundred (200) feet along the highway, shall give audible warning with a horn or other warning device."

This rule emphasizes the character of control a motorist should maintain when driving on a highway in which there are hills, curves, etc., of such nature as to obscure the power of vision ahead. It applies with equal or greater force to a grade crossing such as we are now dealing with. Huddy's Automobile Law, Volume 34, Secs. 50 and 162, discusses this rule cogently.

Matulich v. Crockett et ux., La.App., 184 So. 748, 749, also deals with the control rule and, in passing, said: "It is well established that the miles per hour an automobile is traveling is not the controlling factor in determining whether the speed of the car is excessive. See Quintano v. Ibos, 14 La.App. 73, 128 So. 186, and Johnson v. Bisso Ferry Co., 13 La.App. 159, 162, 127 So. 661. On the contrary, the velocity of the automobile must always be commensurate with the conditions prevailing at the time of the accident."

Plaintiff was promptly carried to a sanitarium in the City of Monroe, in which he was a patient for forty (40) days. X-ray pictures of his neck and head were made. No fracture or other head injury was revealed. A fracture of the lateral arch, right side, of the second cervical vertebra, near the body, was disclosed. The fracture extended obliquely entirely across the length of the arch and was open 1/16 of an inch. No material displacement resulted.

While in the sanitarium, plaintiff was treated by Dr. I. J. Wolff. He was semiconscious when the pictures were made and when first visited by this physician. On account of the character and location of the fracture, Dr. Wolff deemed it best to keep plaintiff in full recumbent position, with sand bags on each side of neck to accomplish complete immobilization. After the lapse of three weeks the greater part of the swelling had disappeared and the pain materially reduced. It was then that a cast was applied. It reached from the midportion of the ears to the shoulders and fixed and held the neck in proper position. The cast was removed on the ninety-eighth (98th) day. During this period and the stay in the sanitarium plaintiff experienced considerable pain and an abundance of discomfort.

Dr. Wolff gave the following testimony touching plaintiff's condition the date of trial (five and one-half months after the accident) to-wit:

"Q. Now, Mr. McDanell testified he is still suffering a great deal from that injury, and that he cannot use himself hardly any way, and when he wakes up in the morning he has to aid himself by picking up his head—that is bracing his head with his hand, and if he takes too much exercise it hurts him. State to the Court whether or not such complaints are justified. A. They are.

"Q. What, in your opinion, is his suffering now? A. There could be some impingement upon some of the minor nerves that supply his muscles of the neck.

"Q. There could be some fibers or muscles that have never healed that were torn from the impact? A. There could be an impingement in the line of fracture of one of the small nerves.

"Q. Dr. Wolff, Mr. McDanell stated that he couldn't see down before him to carry on any work or do any work, without moving his entire body; that his neck is stiff, or an ankylosed condition. That true or not? A. There is a slight, I would say a moderate degree of ankylosis there now, that is fixation. * * *

"Q. Will he ever be able to do any manual labor? Any kind at all? A. That depends upon the callous or bone formation that is there. These cases probably will go over a period of some five or six months apparently all right, apparently so, and then some blow, some short deviation of the neck or cervical vertebra, or some slight twist may refracture that area.

"Q. Are you satisfied that he is totally disabled from work now? A. In his present condition he is.

"Q. Would you hazard a guess as to when he ever will be able to work again? A. I cannot place a time limit on that, Mr. Coon."

No other physician testified for or against plaintiff. We assume that the correctness of Dr. Wolff's professional opinion, reflected from the quoted testimony, is not challenged by defendant.

Dr. Wolff also testified that he was unable to detect any improvement in plaintiff's physical condition since removing the cast.

We are not convinced that plaintiff's injury will incapacitate him permanently for manual labor, the sort of work he has followed for a livelihood, but on the contrary, we believe that unless he experiences another accident involving the neck, he should, after the lapse of a year or so, be able to resume work, but probably with some inconvenience and discomfort. There will likely be permanent limitations of movement of the neck and head due to callous or ankylosis about the fracture. Dr. Wolff could not definitely foresee the ultimate result and no one else can do so. We do know that fractures of the neck vertebrae are always serious and often their injurious effect never entirely disappears. No surgical operation is recommended as a panacea for such a condition.

The record does not disclose plaintiff's age. He has a son sixteen (16) years old and testified that he had followed logging for twelve (12) years for a living. We judge him to be near forty (40) years old.

The doctor's bill and costs of the X-ray pictures amount to $267. The room in the sanitarium cost $100 for forty (40) days. For pain, suffering, discomfort and disability, we think an award of $3,500 adequate. We are unable to find a precedent with facts such as appear in this case.

For the reasons herein stated, the judgment of the lower court is reversed, annulled and set aside and there is now judgment in favor of plaintiff, Charlie Clifton McDanell, and against defendant, B. Frank Hargrove, for $3,867, with legal interest thereon from judicial demand herein and for costs of the suit.